IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

**HARLEY HAZZARD**

    **Plaintiff,**

v.                                 **Docket No.**
                                     **Jury Demand**

**TT OF F. FRANKLIN, INC.**

    **Defendant.**

## COMPLAINT

Comes the plaintiff, through counsel, and would show the court the following:

## PARTIES

1.  Plaintiff is a citizen and resident of the State of Tennessee and is 59 years old.

2.  Defendant TT OF F. FRANKLIN, INC. **["hereinafter "Defendant"]** is a Tennessee corporation with its principle office located at 505 South Flagler Drive, Suite 700, West Palm Beach, Florida 33401. The registered agent for service of process is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

## JURISDICTION AND VENUE

3.  This court has jurisdiction pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 621 et seq. (ADEA), 29 U.S.C.A.

623d, the Tennessee Human Rights Act, T.C.A. 4-21-101 et seq and the common law of Tennessee. Plaintiff has received a Notice of Right to Sue which is attached as an exhibit to this Complaint.

4. Venue is proper in that the acts complained of occurred within the confines of the jurisdiction of this court.

## FACTS

5. Plaintiff was hired by the defendant in May 2003 as a Collision Center Manager. Plaintiff was wrongfully terminated on December 1, 2012.

9. During the years preceding his termination, plaintiff had been an exceptional employee and built up a substantial customer base for the defendant.

10. On or about October 12, 2011, Marc Sizemore, **[hereinafter "Sizemore"]** Body Shop Director for the defendant, visited plaintiff's workplace. After briefly walking around the body shop, Sizemore asked plaintiff to go for a ride with him in his car. As soon as the car left the premises, Sizemore asked plaintiff "how old are you?" Also, he asked plaintiff "what are your plans for retirement?" Plaintiff replied "I have a 401(k)." Sizemore said "I don't mean that, how long do you plan on working?" Plaintiff was shocked and appalled by these age-related inquiries. Plaintiff wanted to immediately report this to Gregg Brown **[hereinafter "Brown"]** who was his immediate supervisor. However, Brown was out of town.

11.  On or about October 17, 2011, Brown returned from out of town and Plaintiff immediately went to him and discussed the conversation that Sizemore had with him regarding his age.  Plaintiff explained that he was upset about these age-related questions and wanted to know what his age and retirement plans had to do with his job.  It was after this conversation with Brown that work conditions for the plaintiff changed dramatically.

12.  Plaintiff would aver that there were other age-related statements made by management to further make him wary of defendant's motives.  In that same week, Brown told plaintiff about a job applicant, Tony Newell, who was coming in to interview for a body shop writer position.  Brown told plaintiff "he is old . . .  but see what you think".  Again, plaintiff found that this age-related statement to be uncalled for and extremely degrading.

13.  On or about October 31, 2011, plaintiff was working in his office with new employees, without a secretary, and greeting customers.  Brown called plaintiff on the phone and paged him throughout the day making inquiries regarding his "figures" and whether or not they were at a certain number.  Brown then stated that "if I (plaintiff) don't do the numbers that are expected, anything else is unacceptable."  He stated "from this point forward our relationship is business only".  Brown began to avoid plaintiff and failed to acknowledge him when they crossed paths at work. This had never happened before in the nine years plaintiff was employed.

14. Plaintiff was ultimately terminated on December 1, 2011 and replaced by a younger employee, which was in his early 40's. The pretextual reason for his termination was that he was "not producing." This statement was false in that plaintiff was "producing" until the defendant pulled large accounts from his shop, an action which was out of his control. Production problems were never addressed with the plaintiff prior to his retaliatory firing. In fact, the only reason for any low production, if any, was due to the defendant outsourcing business to other locations.

15. Plaintiff would aver that the reason he was terminated was based upon his age, 59, and the fact that he complained about the age-related statements made by Sizemore.

16. As a result of the above retaliatory discharge and age discrimination, plaintiff has suffered severe emotional distress. Plaintiff has had difficulty sleeping, is depressed and must take anti-depressant medication. His family is faced with mounting financial problems causing them to have extreme difficulty paying their bills. Due to his wrongful termination, plaintiff has been unable to obtain employment that paid anywhere near what he was receiving with the defendant which was $80,000 to $90,000 per year. In his current job he makes approximately $40,000 per year but he must pay for his own fuel for his truck which costs approximately $400 per week.

17. Plaintiff would aver that the reasons for his termination i.e. that he "could not produce", were concocted by the defendant. The statement that

plaintiff "could not produce" amounts to fraud, deceit and misrepresentation. As an example of defendant's fraudulent motive, approximately one month before plaintiff's termination, Brown stated in an e-mail to all employees this said "thanks to everyone for a solid October". Finally, Plaintiff would aver that his September 2011 business was "slow" which has always been the case, but the rest of the year was "good".

18. Plaintiff would aver that the defendant violated its own company policy. For example, on page 10 of defendant's employee handbook it is stated, *inter alia*, as follows:

a. That "if an employee is not performing the company should... "Let them know the good and the bad"... and that "They won't know they are doing it wrong unless you tell them..." And "there should be "periodic evaluations". " (Page 10, employee handbook).

b. Further, at page 12 and 13 of the employee handbook it is stated in the corrective action procedures section that the company should... "Outline the specific infraction "... "Refer to the specific policy against the behavior"... and "Explain termination if continues". Also, the employee should be given a , , , "Realistic time frame(s) for approval and "to... "Terminate the employee after they are disciplined for the behavior" ... and only "if discipline was previously documented"... "Determine(d) that steps have been taken so the employee should not be surprised"...and finally . . . Provide a "specialized input-agreement between senior management and direct manager."

Plaintiff would aver that none of the above transpired before his termination.

**WHEREFORE, PREMISES CONSIDERED**, plaintiff prays as follows:

1. That the defendant be served with a copy of the Summons and Complaint and be required to answer within the time prescribed by law.

2. That the plaintiff be awarded compensatory damages in the amount of $1 million which include lost wages, front pay, emotional distress, embarrassment and humiliation, loss of enjoyment of life and punitive damages in a like amount

3. That the plaintiff be awarded reasonable attorneys fees and that the cost of this cause be assessed against the defendant.

4. That a jury be impaneled to hear this case.

Respectfully submitted,

s/James L. Harris No. 014173
s/Robert J. Shockey No. 2092
Attorney at Law
2400 Crestmoor Road
Nashville, Tennessee 37215
Phone 615-260-3677
Fax 615-297-6855
jhar401@comcast.net